USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/27/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA,

                Plaintiff,

-against-

ROLAND ANGUIANO,

                Defendant.

-----------------------------------------------------------X

14-cr-711 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

By motion noticed July 10, 2015, defendant Roland Anguiano ("Defendant") seeks, on the papers submitted and an evidentiary hearing, suppression of the firearm and narcotics recovered on October 18, 2014 in connection with his arrest. For the reasons that follow, the motion is DENIED.

A. Background

On June 23 and 30, 2015, the Court held an evidentiary hearing on Defendant's motion to suppress evidence recovered from him during a patdown at a traffic stop and subsequent search incident to his arrest. At the hearing, the Government proffered the following evidence: On October 18, 2014 around 10:40 p.m., Sergeant Kevin Lahar of the Newburgh Police Department (the "Newburgh PD") received a phone call from a confidential informant (the "CI"), who had been providing information for approximately two months in exchange for money and pursuant to an agreement with a local prosecutor related to a charge for selling narcotics. (Tr. of Mot. to

Suppress Hr'g. at 21, 24–25, 30, June 23, 2015.)  Prior to receiving the instant tip, the CI provided information that had led to the recovery of approximately seven firearms and an unspecified amount of narcotics, in addition to five or six arrests.  (*Id.* at 22–24.)  Moreover, the CI is currently assisting federal authorities in connection with an active homicide investigation.  (*Id.* at 8.)  Sergeant Lahar had personally met this CI, knew his name and phone number, and had previously received two tips from the CI leading to the recovery of four illegal firearms.  (*Id.* at 21–22.)  The CI's success in part stemmed from his or her familiarity with people who carry guns, including spending time with them on the street and observing their behavior.  (*Id.* at 78.)  Based on this track record, Sergeant Lahar believed that the CI was reliable, accurate, and credible.  (*Id.* at 25.)

When the CI called Sergeant Lahar on the evening of October 18, 2014, the CI said that he had just observed Sergeant Lahar conduct a traffic stop on City Terrace in Newburgh, NY.  (*Id.* at 29.)  Shortly after Sergeant Lahar left the area of the traffic stop, the CI saw a group of Hispanic males emerge from a nearby house on City Terrace at the corner of Van Ness Street and look up and down the street.  (*Id.* at 29–30.)  The CI then heard one or more of the Hispanic males say something to the effect of "all clear."  (*Id.* at 30).  The group of Hispanic males then entered a yellow minivan taxi cab, which drove north on City Terrace and turned left onto First Street traveling west.  (*Id.* at 29–30, 33.)  The CI reported that in looking up and down the street, the men were checking if police officers were in the area.  (*Id.* at 30–31.)  In addition, the CI said that the men had been involved in a shooting or gun possession incident the previous night and that they possessed a gun.  (*Id.* at 31, 43, 58–59, 61, 77–78.)  Sergeant Lahar regularly patrolled this area during each of his shifts and, based on his twelve years of experience with the

Newburgh PD, testified that this area is known for shootings, assaults, robberies, and narcotics dealing, among other crimes. (*Id.* at 26, 28–29.)

When Sergeant Lahar received the CI's tip he was on South Street between Dubois Street and North Miller Street, no more than six blocks away from the location described by the informant. (*Id.* at 33.) Sergeant Lahar immediately radioed to his fellow officers that he had received information from a CI that approximately five people, one of whom may be in possession of a gun, had just entered a taxi traveling in the area of City Terrace and First Street. (*Id.* at 89–90.) Sergeant Lahar then turned south onto Dubois Street, drove four blocks, and turned right onto First Street heading the same direction as the CI reported the van was traveling. (*Id.* at 33–34.) Approximately ninety seconds after receiving the tip, Sergeant Lahar spotted a yellow minivan taxi with five or six Hispanic males. (*Id.* at 34–35.) He pulled into the parking spaces to the right of the van, which was waiting at a red light facing west on Broadway at the intersection of Robinson Avenue, approximately four or five blocks from where the CI saw the men enter the van. (*Id.*) He did not see any other yellow taxis in the area. (*Id.* at 34.) Immediately after the light turned green, the van made a quick left turn to head southbound on Robinson Avenue. (*Id.* at 35.) While making this turn, the van failed to yield to oncoming traffic, forcing cars traveling east on Broadway to apply their brakes to avoid a collision, and violating a New York traffic law—failure to yield the right of way. (*Id.* at 35.)

Sergeant Lahar radioed his fellow officers, Timothy Gliedman and Deputy King, who were at the same intersection in a marked police vehicle and who had received the prior radio transmission reporting the CI's tip, to stop the van. (*Id.* at 36, 89–90.) Immediately upon approaching the van, Officer Gliedman saw multiple people inside the van and smelled raw marijuana emanating from the driver's side window, which was rolled down. (*Id.* at 92, 104.)

3

Meanwhile, other officers from the Newburgh PD and the Orange County Sheriff's Department had arrived on scene, including Officer Hinspeter, Officer Sickler, Officer Cerrone, and Deputy Volpe. (*See id.* at 37, 44, 92.) Sergeant Lahar and Deputy King approached the passenger side of the van and observed multiple Hispanic males sitting inside. (*Id.* at 37.) Sergeant Lahar heard Officer Hinspeter ask, "Who's got the weed?" and saw him open the sliding door on the driver's side of the van. (*Id.* at 38.) Immediately thereafter, Sergeant Lahar opened the sliding door on the passenger's side, smelled raw marijuana himself, ordered out the passengers, with Defendant among them. (*Id.* at 41–42.) Sergeant Lahar described the smell emanating from the van as "extremely potent" and "some of the strongest smelling marijuana in the raw form" that he had smelled in his career; Officer Gliedman described it as "very strong" and "very pungent." (*Id.* at 42, 94.)

Prior to that day, Sergeant Lahar and Officer Gleidman had collectively been involved in approximately 130 marijuana-related arrests, many of them involving raw marijuana during traffic stops. (*Id.* at 39–40, 93–94.) The officers had also received training for how to recognize and detect marijuana. (*Id.*) In 2006, Sergeant Lahar and his canine partner received approximately 240 hours of instruction in detecting narcotics as part of their training to join Newburgh PD's canine unit (*Id.* at 40.) Subsequent to that course, Sergeant Lahar and his canine partner attended monthly training sessions, participated in narcotics detection competitions, and became certified by the United States Police Canine Association. (*Id.*) During these sessions and competitions, and in the field as an officer, Sergeant Lahar frequently smelled both raw and burning marijuana. (*Id.*) Likewise, Officer Gliedman had previously smelled raw marijuana in his police academy training, when processing evidence, and during arrests. (*Id.* at 93.)

In addition to searching the van, Sergeant Lahar and several other officers patted down all of the passengers for weapons because of the risk the traffic stop posed to their safety. Based on the CI's tip, the officers believed an occupant was armed and posed a risk of harm to their safety. (*See id.* at 43, 59, 95.) Sergeant Lahar was patting down a passenger at the back of the van while Officer Sickler and Deputy King were patting down Defendant at the front of the van. (*Id.* at 44–45, 73, 96.) Officer Gliedman heard Deputy King announce, "He has a gun on him," referring to Defendant, and saw other officers now moving to the front of the van to assist. (*Id.* at 96.) Among those officers was Sergeant Lahar, whom Officer Sickler had just told about the gun. (*Id.* at 44–45, 73.) Sergeant Lahar then proceeded to conduct a second patdown and recovered from inside Defendant's pants, specifically his groin area, a loaded Jimenez Arms .25 caliber semiautomatic handgun with a defaced serial number. (*Id.* at 45.) Several of the officers, Sergeant Lahar among them, searched the van for drugs, but did not find any. (*Id.* at 42, 45.) Police also arrested another passenger who had an outstanding warrant and issued the driver two tickets—one for failure to yield and another for operating without a taxi license. (*Id.* at 46, 97.)

Upon arriving at the police station, Defendant was strip-searched by Officer Hinspeter and Deputy King after Sergeant Anderson authorized them to do so. (*Id.* at 47.) During the search, the officers found one bag of marijuana and several small bags of cocaine in Defendant's sock. (*Id.* at 47–48.) Defendant was charged with possession with intent to distribute cocaine, possession of a firearm in furtherance of drug trafficking, and possession of a firearm as a felon. Defendant now moves for suppression of the officers' statements regarding the traffic stop, the gun, and the cocaine on the bases that the CI's tip was unreliable, police lacked probable cause to search the van after it was stopped, and police lacked reasonable suspicion to pat him down prior to arrest and strip-search him at the police station incident to arrest.

**B. Discussion**

At the conclusion of the evidentiary hearing, the Court identified three issues for the parties to address in order to resolve this motion: (1) the reliability of the CI's tip, (2) what observations led the officers to pull over the van, and (3) whether the officers had reasonable suspicion to pat down the defendant. These three issues collectively inform the following analysis.

**1. Police Had Authority to Stop the Vehicle**

After observing the van violate a New York traffic law, police had the authority to stop, and order the passengers to vacate, the van. Once the van was stopped, the circumstances provided reasonable suspicion that a passenger illegally possessed a firearm.

**a. Police Observed the Van Violate a Traffic Law**

Police have a "sufficient basis under the Fourth Amendment . . . to make a traffic stop" if they observe a vehicle violate a traffic law. *United States v. Stewart*, 551 F.3d 187, 193 (2d Cir. 2009). "The driver of a vehicle intending to turn to the left within an intersection . . . shall yield the right of way to any vehicle approaching from the opposite direction." N.Y. Veh. & Traf. § 1141. Here, based on Sergeant Lahar's own observations, he had authority to pull over the van for failure to yield to oncoming traffic when turning left from Broadway onto Robinson Avenue. Even if Sergeant Lahar had instructed Officer Gliedman to pull over the van prior to the driver violating the traffic law, which is not clear from the radio recordings from that evening, the traffic violation would nevertheless provide a basis for the stop independent of the CI's tip.

**b.  Police Had Reasonable Suspicion that an Occupant was Armed and Dangerous**

Police may detain a suspect to investigate a crime if they have "reasonable suspicion to believe that criminal activity has occurred or is about to occur." *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995) (internal quotation marks and citation omitted).  "Reasonable suspicion may be based upon information from a confidential informant so long as the tip bears sufficient 'indicia of reliability.'  As in the probable cause context, courts must assess whether an informant's tip establishes reasonable suspicion under the totality of the circumstances approach . . . though obviously a lesser showing is required." *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007) (internal citations omitted).  A totality of the circumstances analysis "permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant's tips." *Illinois v. Gates*, 462 U.S. 213, 234 (1983).  A court may consider several factors, such as the "veracity, reliability, and basis of knowledge" of the informant and whether the police independently corroborate key parts of the tip. *United States v. Gagnon*, 373 F.3d 230, 235–236 (2d Cir. 2004).  The CI's information had sufficient indicia of reliability because of his known identity to police, successful track record of providing tips leading to the recovery of firearms, and the specificity of the information.  Prior to pulling over the van, Sergeant Lahar corroborated key parts of the tip, namely the color and type of vehicle, the race and approximate number of occupants, the general location of the van, and the direction in which it was travelling.  This level of corroboration is enough to reasonably infer that the unverified part of the tip—that an occupant possessed a gun—is also true because "the informant is known from past practice to be reliable." *Elmore*, 482 F. 3d at 181.

## 2. Police Had Authority to Search the Defendant

During a traffic stop, police may order a passenger out of a vehicle, *Maryland v. Wilson*, 519 U.S. 408 (1997), and pat down that passenger if police have a reasonable suspicion, based on the totality of the circumstances, "to think 'that the person stopped is armed and dangerous.'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (quoting *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)).[1] The standard for establishing reasonable suspicion to pat down a person during a traffic stop is particularly low in high-crime areas at night because these situations present officers with unique physical danger. *See Johnson*, 555 U.S. at 330; *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Adams v. Williams*, 407 U.S. 143, 147–48 (1972); *Holeman v. City of New London*, 425 F.3d 184, 191 (2d Cir. 2005). If a police officer who is trained and experienced in detecting narcotics smells marijuana during a traffic stop, the officer has probable cause to search the vehicle for contraband. *United States v. Colon*, No. 10 Cr. 498 (RPP), 2011 U.S. Dist. LEXIS 14106, at *31 (S.D.N.Y. Feb. 8, 2011) (citing *United States v. Jackson*, 652 F.2d 244, 251 n.6 (2d Cir. 1981)).

Here, Sergeant Lahar pulled over a vehicle late at night in a high-crime area based on a reliable tip that an occupant had a firearm and was possibly involved in a shots-fired incident the night before. Given these circumstances, the officers on the scene had a reasonable suspicion that occupants of the van were armed and dangerous. This suspicion formed the basis of a *Terry* stop to protect themselves. Pursuant to this justified search, police found an illegal firearm in Defendant's pants and lawfully arrested him. In light of the lawful arrest, the subsequent strip

---

[1] These investigatory detentions are commonly referred to as *Terry* stops. *See Terry v. Ohio*, 392 U.S. 1, 30 (1968).

search and recovery of contraband on Defendant's person at the police station were proper. *See Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986).

## C. Conclusion

Defendant's motion to suppress the firearm and narcotics recovered on the day of his arrest, on the papers submitted and the evidentiary hearing, is DENIED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 24. The parties are directed to appear for a status conference at 11:30 a.m. on September 10, 2015, as previously scheduled.

Dated: July 27th, 2015
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge